UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| OXANE MATERIALS, INC. | § | CASE NO. 15-32940 |
| (Debtor) | § | (Chapter 11) |
| | § | |

**EMERGENCY MOTION OF THE DEBTOR FOR (I) AN ORDER
APPROVING BIDDING PROCEDURES AND BIDDER
PROTECTIONS FOR THE SALE OF CERTAIN DESIGNATED ASSETS;
AND (II) AN ORDER APPROVING THE SALE OF CERTAIN
DESIGNATED ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS,
AND ENCUMBRANCES PURSUANT TO 11 U.S.C. §§ 105, 363(B), (F), (M), AND 365,
<u>AND GRANTING RELATED RELIEF</u>**

**(Hearing requested for June 5, 2015 at 10:00 a.m.; estimated time: 1 hour)**

Oxane Materials, Inc., the above-captioned debtor and debtor-in-possession (the "**Debtor**" or "**Seller**"), by and through its undersigned counsel, hereby moves the Court (the "**Motion**") pursuant to sections 105, 363, and 365 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") for entry of (i) an order approving bidding procedures and bidder protections for the sale (the "**Sale**") of all intellectual property assets of the Debtor (the "**Purchased Assets**" or the "**IP Assets**"), and (ii) an order (a) authorizing the sale of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), (m), and 365 of the Bankruptcy Code, (b) to the extent necessary, authorizing the Debtor to assume and assign executory contracts under section 365 of the Bankruptcy Code; and (c) granting related relief.  In support of this Motion, the Debtor respectfully states as follows:

## I.  JURISDICTION, VENUE, AND CONSTITUTIONAL AUTHORITY

1.      The Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334.  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is core within the meaning of 28 U.S.C. § 157(b).

2.      The statutory predicates for the relief sought include sections 105,363, and 365 of the Bankruptcy Code, and Rules 2002, 6004, and 6006 of the Bankruptcy Rules.

3.      The Court has constitutional authority to determine this matter because the relief sought is not a "matter which, from its nature, is the subject of a suit at the common law, or in equity, or in admiralty."  *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. __, No. 13-935, slip op. at 1 (2015) (quoting *Stern v. Marshall*, 564 U.S. __, 131 S.Ct. 2594, 2609 (2011)).  Rather, the relief sought in this motion "flow[s] from a federal statutory scheme." *Stern*, 131 S.Ct. at 2614.

## II.  BACKGROUND

### A.      Procedural Background

4.      On May 31, 2015 (the "**Petition Date**"), the Debtor filed for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to manage and operate its businesses as a debtor-in- possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.   No prior request for the relief requested in this Motion has been made.

5.      No request has been made for the appointment of a trustee or examiner, and a creditors' committee (the "**Committee**") has not been appointed in this case.  In addition, no known creditors' committee existed prior to the Petition Date.

6.      The Debtor provides oil and gas exploration and production companies with customized proppants (solid materials used to keep hydraulic fractures open), which economically augment oil and gas production from conventional and unconventional oil and gas reservoirs, while also offering the opportunity to reduce the environmental impact of hydraulic

fracturing.  The Debtor's assets include both valuable intellectual property and certain lab, manufacturing, and transportation-related assets and materials.  A full description of the business of the Debtor and the events leading up to the filing of the voluntary petition by the Debtor will be provided in a declaration to be filed.

7.     The Debtor's estate includes certain valuable IP Assets, including those IP Assets described in the list attached as **Exhibit A** to this Motion.  The value of the IP Assets does not significantly depend on the Debtor's other assets, nor does the value of the Debtor's other assets significantly depend upon the IP Assets.  In other words, the IP Assets may be separated from the remaining assets without any significant destruction of value.

8.     The Debtor's long course of business leading up to the bankruptcy, and in particular its extensive efforts to market its innovative products, demonstrates that to utilize the IP Assets profitably will require more capacity and resources for development than the Debtor will be able to muster.  Accordingly, the Debtor wishes to arrange for a sale of the IP Assets at the price that is most advantageous to its bankruptcy estate.

9.     To that end, the Debtor has located a potential buyer, Halliburton Energy Services Inc. ("**Halliburton**," or the "**Buyer**"), which has agreed to conduct due diligence concerning the IP Assets and, if the proposed three-week due diligence period is completed successfully, to serve as stalking-horse bidder for an auction for the IP Assets, per the terms reflected in the term sheet (the "**Term Sheet**") attached as **Exhibit B** to this Motion, which the parties intend to memorialize in a purchase agreement in due course.  The proposed stalking-horse bid is $2,500,000.

10.    In addition, in the event that the Buyer opts not to proceed at the end of its due diligence, the Debtor will seek further relief from the Court.  If the Debtor believes that the

auction could go forward without the Buyer, it will so advise the Court, and request that the Court approve revised sale procedures, ideally involving a new stalking horse bidder in place of the Buyer.  If the Buyer opts out and the Debtor believes that no other Qualified Bids are likely to be forthcoming, the auction and proposed sale may be cancelled, and the Debtor will return to this Court to propose some other sale process as may be appropriate.

11.     Accordingly, the Debtor requests that the Court enter a bidding procedures order as soon as possible, and a sale order after the Court has held a Sale Hearing.

### III.  <u>RELIEF REQUESTED</u>

12.     By this Motion, the Debtor seeks entry of two orders:  ***First***, at an expedited hearing to be held on a date set by order of the Court, the Debtor requests entry of an order, in substantially the form attached hereto as <u>**Exhibit C**</u> (the "**Sale Procedures Order**"), among other things, (a) approving the Debtor's proposed procedures for submitting and considering competing bids for the Purchased Assets, including the proposed form and manner of notice and the related dates and deadlines (the "**Sale Procedures**"), and (b) approving the Debtor's proposed bidder protections for the Buyer as the stalking horse bidder, as described below (the "**Bid Protections**").

13.     ***Second***, the Debtor requests the entry of an order (the "**Sale Order**"), (a) authorizing the Sale of the Purchased Assets to the Buyer as stalking horse bidder, or to a higher and better bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant sections 105, 363(b), (f), and (m) of the Bankruptcy Code; (b) to the extent necessary, authorizing the Debtor to assume and assign executory contracts under section 365 of the Bankruptcy Code; and (c) granting related relief.

A.    <u>**The Term Sheet**</u>

14.    On June 2, 2015, the Debtor and Halliburton executed the Term Sheet, which lays out proposed terms for due diligence, sale procedures, stalking horse bidder protections, and the proposed transaction.[1]  The principal terms of the Term Sheet are summarized and highlighted as follows:[2]

| Transaction | The Buyer will acquire designated IP Assets of the Debtor ("**Seller**"). |
|---|---|
| **Purchase Price** | The total consideration to be paid by Buyer under the Purchase Agreement (the "**Purchase Price**") consists of $2,500,000 in cash. |
| **Purchased Assets** | The IP Assets, including but not limited to: an assignment of all intellectual property owned or licensed by the Seller, including the assets listed on <u>Exhibit A</u>, all foreign and domestic patents or patent applications related to or arising out of any of the assets listed on <u>Exhibit A</u>, as well as any other foreign and domestic patents, pending patent applications, trademarks (registered and common law), pending trademark registrations, copyrights, pending copyright registrations, software, trade secrets, know-how, and any and all books, records, contracts, lab notebooks, drawings, technical manuals, operating manuals, pictures, web pages, engineering drawings, technical specifications, presentations, technical data, manufacturing procedures, purchase specifications and agreements related thereto.  IP Assets shall also include an assignment of all licenses (to the extent assignable) and nondisclosure or inventions assignment agreements owned by Seller that relate to any of the foregoing or are otherwise necessary or useful to make, have made, practice, use, import or sell any of the technology embodied in the other IP Assets.  All of the IP Assets transferred to Buyer will be free and clear of any liens, claims and encumbrances and any such liens, claims or encumbrances will attach to the proceeds of the sale.  Any assets not specifically transferred and assigned to Buyer, and any liabilities relating thereto, shall remain the property of Seller. |
| **Excluded Assets** | The Excluded Assets shall include all of Seller's assets aside from the IP Assets. |

---

[1] Defined terms not otherwise defined herein shall have the meaning ascribed to them in the Term Sheet.

[2] To the extent there is any inconsistency between the description in this Motion or any resulting Order and the terms of the Term Sheet or the eventual Purchase Agreement, the Term Sheet or the Purchase Agreement shall control, and the terms of the Purchase Agreement shall control over the Term Sheet.

| | |
|---|---|
| **Closing** | The Transaction will close at a date as soon as possible after the approval of the Transaction by the Bankruptcy Court, subject to satisfaction of all closing conditions and receipt of Bankruptcy Court approval of the Transaction. |
| **Deposit** | A good-faith deposit of 10% of the Purchase Price will be provided by any bidder aside from the Buyer. |
| **Due Diligence, Purchase Agreement, and Cure Notice** | The Buyer will have a twenty-one (21) day due diligence period (the "**Due Diligence Period**") beginning upon the date of the filing of this Motion.  Reasonably soon after the filing of this Motion, the Buyer and the Debtor will agree upon the form of the Purchase Agreement, and will file it with the Court and circulate it to all known potential bidders. (If Buyer opts out of the transaction prior to a form of Purchase Agreement being agreed upon, the Debtor shall draft and circulate a Purchase Agreement that is acceptable to the Debtor and is on commercially reasonable terms, so that potential buyers may consider whether they would like to proceed to make an offer even in absence of the Buyer.)  If at the end of the Due Diligence Period the Buyer opts not to proceed, then the Debtor will promptly provide notice to the Court and all potential bidders, and will seek revised approval for sale procedures if serious potential bidders have stepped forward; otherwise, the Debtor will seek to modify this sale process and propose to the Court some other means of proceeding. |
| **Relationship between Buyer and Debtor** | There is no relationship between the Buyer and Debtor. The transaction is an arm's length transaction, negotiated in good faith. The Debtor will have no relationship or connection with the Buyer after the consummation of the sale. |
| **Notice Timing** | Notice of the hearing on the motion to approve the motion to sell will be provided as is necessary under the circumstances. |
| **Cure Amount and Notice** | As soon as the information is reasonably available, notice of the form of the Purchase Agreement will be served along with proposed cure amounts (the "**Cure Notice**") to any parties to executory contracts that the Debtor determines need to be assumed and assigned in order for the transfer of the IP Assets to be effectuated.  As provided for the in Sale Procedures Order, any objections to proposed cure amounts, or to the assumption or assignment, shall be filed by the Sale Objection Deadline—provided that the cure objection deadline shall not in any event be sooner than seven days after the Cure Notice is provided. |

15.     The terms and conditions of the proposed transaction are set forth in summary form in the Term Sheet, and reference should be made to the Term Sheet for additional terms.  If the Buyer's Due Diligence period is concluded successfully and the Buyer is willing to proceed, then a Purchase Agreement shall be entered into between the Debtor and the Buyer. To the extent there is any inconsistency between the summary of the transaction set forth in this Motion or in the Term Sheet and the terms in the Purchase Agreement, the Purchase Agreement shall control.

**B.      Proposed Bidding Procedures**

16.     The Debtor requests approval of the following procedures for submitting and considering bids for the Sale of the Purchased Assets, including the related dates and deadlines described below:

      (a)      **Participation Requirements**.  Parties interested in making a competing bid for the purchase of some or all of the Purchased Assets (each, a "**Potential Bidder**") will be required to execute a confidentiality agreement in form and substance acceptable to the Debtor prior to gaining access to the due diligence materials.  The Buyer has already executed such an agreement.

      (b)      **Due Diligence**.  Potential Bidders will have a twenty-three (23) day due diligence period beginning upon the date of the filing of this Motion, during which time Potential Bidders may seek due diligence access or additional information as may be reasonably requested by the Potential Bidder and that the Debtor, in its business judgment, determines to be reasonable and appropriate under the circumstances.

      (c)      **Submission of Bids**.  In order to qualify as a Qualified Bid (as defined below) for the Purchased Assets, a Potential Bidder must timely submit a written bid that satisfies the following criteria:

            i.      The bid must exceed the Purchase Price by at least $50,000 plus, if the stalking-horse bidder is the Buyer, an amount sufficient to pay the Breakup Fee (defined below) of $100,000—*provided that*, if the Buyer opts not to proceed at the end of its Due Diligence Period and subject to Court approval of a revised process, a Qualified Bid may be approved at some other amount;

            ii.      The bid must be accompanied by a cash deposit (in the form of either a cashier's check or wire transfer) in an amount equal to 10% of the aggregate value of such bid (each, a "**Good Faith Deposit**").  Regardless of

method of payment, all Good Faith Deposits must be remitted to Debtor's counsel, Taube Summers Harrison Taylor Meinzer Brown, L.L.P., Attn: Eric J. Taube, Esq. and Morris D. Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701;

       iii.    The bid must be accompanied by an executed Purchase Agreement in substantially the form of the Purchase Agreement and a blackline showing any modifications the bidder is proposing, and that:

       a.    indicates which of the Purchased Assets such bidder proposes to acquire pursuant to the Purchase Agreement; and

       b.    does not contain any conditions to closing which are not contained in the Purchase Agreement (including financing and due diligence) or is based on terms or conditions any less favorable, or otherwise more burdensome or conditional than those set forth in the Purchase Agreement;

       iv.    The bid must include a reference from a financial institution demonstrating that the Potential Bidder (or the entity that will furnish the funding required to consummate and perform under the Purchase Agreement) has sufficient available funds to close the transaction; and

       v.    The bid must contain a written statement identifying the controlling interest holders in the acquiring entity and evidence that the board of directors (or comparable governing body) for the entity making the bid has fully authorized and approved the submission, execution, and delivery of the Purchase Agreement and the consummation of the transactions contemplated thereby.

       vi.    The bid must be delivered to the following parties: (i) the Debtor, Oxane Materials Inc., c/o Gregory S. Milligan, 401 Congress Avenue, Suite 1540, Austin, Texas 78701; (ii) the Debtor's counsel, Taube Summers Harrison Taylor Meinzer Brown, L.L.P., Attn: Eric J. Taube, Esq. and Morris D. Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701; and (iii) counsel for the Buyer, Haynes & Boone, L.L.P., Attn: Henry Flores, Esq., 1221 McKinney St., Suite 2100, Houston, Texas 77010.

       (d)    **Qualification of Bid**.  After a Potential Bidder has delivered a bid, the Debtor, in consultation with any official Committee (if one is appointed), will determine whether (i) the Potential Bidder has demonstrated the financial capacity to consummate the purchase of the Purchased Assets, (ii) is reasonably likely to be able to and willing to consummate the contemplated transactions, and (iii) has otherwise timely satisfied the requirements described above.  If so, the Debtor shall designate such potential bidder as a "**Qualified Bidder**" and such bid as a "**Qualified Bid**," and will promptly notify such bidder and the Buyer of this determination.

(e)     **Deadline for Submission of Bids**.  The deadline for submitting any and all competing bids shall be no later than June 26, 2015 at 5:00 p.m. (prevailing Central time), or such other date as is established by the Court (the "**Bid Deadline**").

(f)     **Auction**.  In the event that Qualified Bids are received, the Debtor will conduct an auction (the "**Auction**") to determine the highest or best bid for the Purchased Assets on July 1, 2015, or such other date as may be established by the Court, at the law offices of the Debtor's counsel, Taube Summers Harrison Taylor Meinzer Brown, L.L.P., 100 Congress Ave., 18th Floor, Austin, Texas 78701, beginning at 10:00 a.m. (prevailing Central time).  The Auction may be adjourned by announcement of the adjournment at the Auction to those parties who appear thereat.

(g)     **Auction Procedures**.  Only Qualified Bidders who have submitted Qualified Bids will be eligible to participate at the Auction.  At the Auction, Qualified Bidders will be permitted to increase and/or improve their bids, provided that Qualified Bidders concurrently increase their Good Faith Deposit to represent 10% of their most recent bid.  The bidding at the Auction shall start and continue in increments of at least $50,000.  The Buyer shall have the right, but not the obligation, to participate in the Auction, and shall be a Qualified Bidder entitled to participate in the Auction.  The Auction shall continue in one or more rounds of bidding and shall conclude when no further bids are received.  During each round of bidding, each participating bidder will have a reasonable opportunity to submit an additional subsequent bid with full knowledge of the then existing highest or best bid and the identity of the other party making the then highest or best bid.  The Debtor may conduct the Auction in the manner it determines will maximize the value of the Purchased Assets.  If there is no Qualified Bid from a party other than the Buyer, the Auction will be cancelled and the Buyer will be declared the Successful Bidder (defined below). The Auction will be transcribed or videotaped. Each bidder is expected to confirm at the auction that it has not engaged in any collusion with respect to the bidding or the sale.  Absent irregularities in the conduct of the Auction, or reasonable and material confusion during the bidding, bids will not be considered after the Auction in closed.

(h)     **Determination of Successful Bidder**.  At the conclusion of the Auction, the highest or best bid, as determined by the Debtor consistent with these Bidding Procedures, shall be designated as the "**Successful Bidder**."  The Debtor may designate the next highest or best bidder for the Purchased Assets at the Auction as the "**Backup Bidder**."  However, a bidder may decline Backup Bidder status and have no obligation to close a transaction, and the Debtor may, in its sole business judgment, continue that same process to obtain a Backup Bidder from among other Qualified Bidders.

(i)     **Sale Hearing**.  Only in the event that the Successful Bidder is a party other than the Buyer, or an objection is timely filed to this Motion by the Sale Objection Deadline (as defined below), the Court will hold a hearing to approve the Sale of the Purchased Assets to the Successful Bidder (the "**Sale Hearing**") on or before July 3, 2015, or such other date as is established by the Court.  Any Sale Hearing shall be an evidentiary hearing and parties shall be prepared to present their evidence in support of or in opposition to the proposed Sale at the Sale Hearing.  If the Successful Bidder fails to

consummate the purchase of the Purchased Assets, the Backup Bidder will automatically be deemed the Successful Bidder.

(j)   **Closing**.  Closing shall take place promptly after the entry of the Sale Order, but in any event no later than on the first business day following the day that is fourteen days after the entry of the Sale Order and after the Sale Order has become a Final Order, or at such other time or place as Buyer and Seller may agree in writing.

(k)   **Return of Good Faith Deposit**.  The Good Faith Deposits of all Qualified Bidders shall be held in escrow by the Debtor's counsel and shall not become property of the Debtor's estate.  Upon the closing of the Sale, the Good Faith Deposit of any Qualified Bidders that are not the Successful Bidder will be returned.

(l)   **Reservation of Rights**.  The Debtor reserves the right, in consultation with its professionals, and any Committee, if any, to alter these Bidding Procedures, and to establish procedures and rules during the Auction, as they may determine reasonably appropriate to maximize the value realized by the estates.

C.   **Proposed Notice Procedures**

17.   Not later than three calendar days after the entry of the Sale Procedures Order, the Debtor will cause a notice of the Sale (the "**Sale Notice**"), to be sent by first-class mail postage prepaid, or by another method reasonably calculated to provide notice, to (i) the Office of the United States Trustee for the Southern District of Texas; (ii) counsel for any official or unofficial committees; (iii) counsel for the Buyer; (iv) counsel for Comerica Bank (the Debtor's primary secured creditor), Winstead PC, Attn: J. Frasher Murphy, Esq., 500 Winstead Building, 2728 N. Harwood St., Dallas, Texas 75201; (v) the Debtor's 20 largest creditors; (vi) all entities known to have expressed a bona fide interest in acquiring the assets being sold; (vii) all affected federal, state, and local regulatory and taxing authorities; (viii) the holders of the subordinated notes, including (without limitation) any entity asserting an interest in the Purchased Assets; and (ix) all other known parties-in-interest in these bankruptcy cases (including any party who has entered an appearance and request for service of papers pursuant to FED. R. BANKR. P. 2002).

18.   The Debtor requests that the Court set a deadline of June 29, 2015 at 5:00 p.m. (prevailing Central time) (the "**Sale Objection Deadline**") as the deadline for any objection to

the relief requested in this Motion to be filed with the Court and delivered to the following parties:  (i) the Debtor, Oxane Materials Inc., c/o Gregory S. Milligan, 401 Congress Avenue, Suite 1540, Austin, Texas 78701; (ii) the Debtor's counsel, Taube Summers Harrison Taylor Meinzer Brown, L.L.P., Attn: Eric J. Taube, Esq. and Morris D. Weiss, Esq., 100 Congress Ave., 18th Floor, Austin, Texas 78701; (iii) counsel for the Buyer, Haynes & Boone, L.L.P., Attn: Henry Flores, Esq., 1221 McKinney St., Suite 2100, Houston, Texas 77010; and (iv) counsel for the Lender, Winstead PC, Frasher Murphy, 500 Winstead Building, 2728 N. Harwood Street, Dallas, Texas  75201.

19.     The Debtor requests that the Court deem this notice and opportunity to object to be sufficient for all purposes.

**D.     Proposed Stalking Horse Bid Protections**

20.     The Debtor also requests that the Court approve the agreement regarding the payment of a breakup fee in the amount of $100,000 (the "**Breakup Fee**"), which is to be paid to the Buyer, in accordance with the Term Sheet and the Purchase Agreement, if the Bankruptcy Court approves the Sale of any or all of the Purchased Assets to an entity other than the Buyer-- *provided that* if Buyer opts not to proceed as stalking horse bidder after its Due Diligence Period, and the Court approves a sale to some other party, the Buyer shall not be entitled to any Breakup Fee.

21.     The requested Breakup Fee was negotiated by the parties in good faith and at arm's length, primarily through counsel, with significant give-and-take.  The Buyer has incurred substantial expenses in negotiating the purchase of the Purchased Assets, and such negotiations and the Buyer's offer for the Purchased Assets will maximize the value to be obtained from the Purchased Assets for the benefit of all creditors.  The Buyer is not seeking any expense reimbursement.  The Buyer has agreed to a fair and open Auction process that increases the

chance of the maximization of value for the estate.  As such, the Debtor has determined, in its business judgment, that the Breakup Fee is reasonable under the circumstances.

## IV.  BASIS FOR RELIEF REQUESTED

### A.  The Bidding Procedures are Appropriate and in the Best Interests of the Debtor's Estate and its Creditors

22.     The dominant goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R, 650, 659 (Bankr. S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [debtor's] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prods., Inc*., 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)), *appeal dismissed*, 3 F.d 49 (2d Cir. 1993).

23.     As a result, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See, e.g., In re Fin. News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991) ("[C]ourt-imposed rules for the disposition of assets . . . [should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates."); *Integrated Res.*, 147 B.R. at 659.

24.     The Debtor believes it is in the best interests of its estate to commence a bidding procedure immediately, as the Debtor has limited funding and resources to proceed with a long sale process.   The Bidding Procedures proposed herein allow for an expedited sale of the

Debtor's assets that is necessitated by its circumstances.  The Debtor also believes that the proposed Bidding Procedures will promote active bidding from seriously interested parties, and will provide a framework for an orderly and fair sale process that will encourage participation by financially capable bidders or will confirm that the Buyer's bid is the best and highest bid for the Purchased Assets.  The proposed Bidding Procedures contain terms typical for a process through which a sale of this nature is consummated and should increase the likelihood that the Debtor will receive the greatest possible consideration for the Purchased Assets.  The Bidding Procedures also set forth a schedule for achieving these objectives in an expeditious manner, balancing the Debtor's desire to maximize recovery for the benefit of the estates, with the need to move quickly to avoid any further deterioration in value.  *See In re Texas Rangers Baseball Partners,* 431 B.R. 706  (Bankr. N.D. Tex. 2010) (approving shortened time frame of less than three weeks between issuance of bidding procedures order by the Bankruptcy Court and auction sale of assets to preserve the value of the purchased assets).

**B.**     **The Notice Procedures are Appropriate**

25.     Under Bankruptcy Rule 2002, the Debtor is required to notify its creditors of any proposed sale of its assets, including a disclosure of the time and place of the Sale Hearing, the terms and conditions of the Sale and the deadline for filing any objections related thereto.  The Debtor's proposed notice procedures, including the Sale Notice, include adequate information to (a) enable interested parties to bid on the Purchased Assets pursuant to the Sale Procedures Order, and (b) inform parties-in-interest of the Sale Hearing and the Sale Objection Deadline. As such, the Debtor believes that the notice to be provided by the mailing of the Sale Notice constitutes good and adequate notice and fully complies with Bankruptcy Rule 2002.

C.     **The Breakup Fee is Appropriate and in the**
       <u>**Best Interests of the Debtor's Estate and its Creditors**</u>

26.     In general, bid protections encourage a potential purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtors' assets, despite the inherent risks and uncertainties of the chapter 11 process.   Typically, bidding incentives are judged under a business judgment standard, which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  *See e.g.*, *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that bidding incentives may "be legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking" (internal quotation marks and citation omitted)).   To receive administrative expense priority pursuant to section 503(b) of the Bankruptcy Code, the bidding incentive must provide some post-petition benefit to the estate. *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999) (identifying at least two instances in which bidding incentives may provide benefit to the estate: first, benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited"; second, where the availability of bidding incentives induces a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely).

27.     Courts typically approve bid protections, like the Breakup Fee, in chapter 11 bankruptcy sales.  *See, e.g., In re Lincolnshire Campus, LLC*, 2010 WL 5269706, at *1 (Bankr. N.D. Tex. July 23, 2010) (approving breakup fee and expense reimbursement under section 503(b) of the Bankruptcy Code in the context of a sale of substantially all of the debtor's assets

under section 363 of the Bankruptcy Code); *In re Texas Rangers Baseball Partners*, 431 B.R. at 715 (same); *In re APP Plus*, 223 B.R. 870, 875 (Bankr. E.D.N.Y. 1998) (approving break-up fee in connection with sale of substantially all of the debtors' assets pursuant to 11 U.S.C. § 363(b)); *In re Kmart*, Case No. 02-B-02474 (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and overbid amounts for potential bidders).

28.     The Debtor believes that the Breakup Fee is fair and reasonable, an exercise of its sound business judgment, and that it provides a benefit to its estate.  Specifically, the Buyer has engaged in extensive analysis and due diligence of the Debtor's assets, and has incurred significant expenses in negotiating the purchase of the Purchased Assets, for which it is not seeking reimbursement.  As a result of the Buyer's efforts, the Debtor has secured a stalking horse bidder for assets, with a minimum price for the Purchased Assets that is fair, reasonable, and on which other bidders can rely.  In light of the costs undertaken by the Buyer, the Breakup Fee serves as an inducement for the Buyer to conduct the costly due diligence necessary to provide a competitive floor bid, and will compensate the Buyer for its risk in the event that it is not the Successful Bidder.  This is especially important given that the Buyer is not seeking any reimbursement of the expenses it has incurred in negotiating the transaction.

29.     Moreover, if the Breakup Fee is triggered, it will be the result of the Debtor securing a higher and better offer for the Purchased Assets, which will benefit the Debtor's creditors.  Consequently, the payment of the Breakup Fee will not diminish the Debtor's estate because it will only be payable if the Debtor consummates a sale that provides consideration that is greater than the Purchase Price by an amount sufficient to pay the Breakup Fee.

30.     The Debtor's agreement to pay the Breakup Fee is the product of good faith, arm's-length negotiations between the Debtor and Buyer.   The Breakup Fee is fair and

reasonable in amount, and it is reasonably intended to compensate the Buyer for the risk of being used as a stalking horse bidder and ultimately being outbid for the Purchased Assets.  Thus, the payment of the Breakup Fee is a sound exercise of the Debtor's business judgment and will provide the a post-petition benefit to the Debtor's estate.

**D.      The Sale of the Purchased Assets Pursuant to the Purchase Agreement is Authorized by Section 363(b) of the Bankruptcy Code**

31.      Section 363 of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate . . . ."  11 U.S.C. § 363(b)(l).  Section 105 provides in relevant part that "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

32.      A sale of a debtor's assets is authorized under section 363 of the Bankruptcy Code if there is a business justification for the sale.  *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986); *see also Myers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (*citing Fulton State Bank v. Schipper (In re Schipper))*, 933 F.2d 513, 515 (7th Cir. 1991)); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986).  Among the factors in determining whether there is sufficient business justification for the sale, the bankruptcy judge:

> should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike. He might, for example, look to such relevant factors as the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis–a-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or

> decreasing in value. This list is not intended to be exclusive, but
> merely to provide guidance to the bankruptcy judge.

*In re Cont'l Air Lines, Inc.*, 780 F.2d at 1226 (*quoting Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*), 722 F.2d 1063, 1071 (2d Cir. 1983)). "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litig. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). When a valid business justification exists, the law vests the debtor's decision to use property out of the ordinary course of business with a strong presumption that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *In re Integrated Res.*, 147 B.R. at 656 (quoting *Smith v. Van Gorkom*, 488 A. 2d 858, 872 (Del. 1985)). Therefore, parties objecting to the Debtors' proposed sale must make a showing of "bad faith, self-interest, or gross negligence." *Integrated Res.*, 147 B.R. at 656.

33.    Moreover, the Bankruptcy Court has authority under section 105(a) of the Bankruptcy Code to approve non-ordinary course transactions under section 363(b) of the Bankruptcy Code. The Fifth Circuit has acknowledged that section 105 confers broad powers on bankruptcy courts:

> [Section] 105 [is] an omnibus provision phrased in such general
> terms as to be the basis for a broad exercise of power in the
> administration of a bankruptcy case. The basic purpose of § 105 is
> to assure the bankruptcy courts power to take whatever action is
> appropriate or necessary in aid of the exercise of their jurisdiction .
> . . .

*See Davis v. Davis (In re Davis)*, 170 F.3d 475, 492 (5th Cir 1999) (citation omitted). While the Debtor realizes that section 105(a) of the Bankruptcy Code "may only be used to carry out the provisions of Title 11," the underlying premise of chapter 11 is the continued and uninterrupted

operation of the debtor in possession to the greatest extent possible. *In re CoServ, L.L.C.*, 273 B.R. 487, 494 n.9 (Bankr. N.D. Tex. 2002). Thus, the Debtor's requested relief is consistent with the "furtherance of the provisions of the Bankruptcy Code." *Id.*.

34. The Debtor has proposed the sale of the Purchased Assets after thorough consideration of all viable alternatives, and has concluded that the Sale is supported by a number of sound business reasons. While the Debtor remains unsure of the most efficient course for its bankruptcy case to take, in any case the IP Assets are distinct and separable from the other parts of the Debtor's business, hence their sale for a significant sum enhances the prospects of maximization of value. Without the Sale, the Debtor does not see any possibility that it could sufficiently raise capital and engage in the necessary preparations and development that would be necessarily to utilize the IP Assets profitably. Hence, the Debtor has determined, in its considered business judgment, that a Sale of the Purchased Assets as requested herein provides the best and most efficient means for the Debtor to maximize the value of its estate, and avoid further deterioration in value.

35. As a result of the Debtor's efforts to date, the Debtor believes that the Buyer's offer is reasonable, constitutes fair and reasonable consideration for the Purchased Assets, and will maximize value. The Purchase Agreement neither impermissibly restructures the rights of the Debtor's creditors nor impermissibly dictates a liquidation plan.

36. Notwithstanding these determinations, however, the Debtor has also proposed a competitive bidding process in order to confirm that the Buyer's offer is the best and highest offer for the Purchased Assets.

37. Based on the foregoing, the sale of the Purchased Assets is justified by sound business reasons and is in the best interests of the Debtor and its estate. Accordingly, pursuant to

section 363(b) of the Bankruptcy Code, the Debtor requests approval of the sale to the Buyer as set forth herein.

**E.      The Sale of the Purchased Assets Free and Clear of Liens, Claims, and Interests is Authorized Under Section 363(f) of the Bankruptcy Code**

38.      The Debtor also requests that the Court authorize the Sale of the Purchased Assets to free and clear of any and all liens, claims, charges, encumbrances and interests (collectively, the "**Interests**"), which may be asserted or otherwise exist, with any such Interests to attach to the proceeds of the Sale of the Purchased Assets, subject to the rights and defenses of the Debtor, if any, with respect thereto.

39.      Section 363 of the Bankruptcy Code provides that a debtor may sell property of the estate free and clear of any other entity's interest in such property if:

> (1)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)      such entity consents;
>
> (3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such Purchased Assets;
>
> (4)      such interest is in a bona fide dispute; or
>
> (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

40.      While the term "any interest," as used in section 363(f), is not defined in the Bankruptcy Code, courts have held that the scope of section 363(f) of the Bankruptcy Code is not limited to *in rem* interests.  *In re Leckie Smokeless Coal Co*., 99 F.3d 573, 581-82 (4th Cir. 1996); *Folger Adam Sec. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 258 (3d Cir. 2000) (citing 3 COLLIER ON BANKRUPTCY 363.06[1]).  Thus, a debtor can "sell its assets under § 363(f) free

and clear of successor liability that otherwise would have arisen under federal statute." *Folger Adam*, 209 F.3d at 258.

41.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the Sale of the Purchased Assets free and clear of all Interests, except with respect to any Interests that are Assumed Liabilities or Permitted Liens under the Purchase Agreement.  *See Citicom Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988).

42.     The Debtor believes that each Interest that is not an Assumed Liability or Permitted Lien satisfies at least one of the five conditions in section 363(f) of the Bankruptcy Code.  In particular, the proposed Sale Order will provide for all Interests to attach to the proceeds from the Sale of the Purchased Assets in the order of their priority and with the same validity, priority, force and effect which such Interests now have against the Purchased Assets, subject to the rights, claims, defenses, and other objections, if any, of the Debtor and parties in interest with respect to such Interests.  The Debtor accordingly requests authority to convey the Purchased Assets pursuant to the requested Sale Procedures, free and clear of all such Interests, other than Permitted Liens and the Assumed Liabilities.

**F.     The Buyer is a Good Faith Purchaser and is Entitled to the Full Protections of Section 363(m) of the Bankruptcy Code**

43.     The potential stalking horse, the Buyer, is a good faith purchaser, entitled to the protections of section 363 of the Bankruptcy Code.  Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the

> appeal, unless such authorization and such sale or lease were
> stayed pending appeal.

11 U.S.C. § 363(m).

44.    While the Bankruptcy Code does not define "good faith," courts have held that there must be a showing of fraud or collusion between the purchaser and the debtor to demonstrate a lack of good faith.  *Bleaufontaine, Inc. v. Roland Int'l (In re Bleaufontaine, Inc.)*, 634 F.2d 1383, 1388 n.7 (5th Cir. 1981) ("Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."); *see also Kabro Assocs. of West Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997) (same); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986) (same).  Courts generally determine that parties have acted in good faith with respect to a proposed sale if the purchase price is adequate and reasonable and the terms of the sale are disclosed fully.  *See In re Abbotts Dairies*, 788 at 149-50.

45.    Here, the Term Sheet was negotiated at arm's length, the Buyer has acted in good faith at all times, and the agreements are not tainted by self-dealing, collusion or manipulation.  The Purchase Price is fair and reasonable, and the terms of the Sale have been fully disclosed and are subject to an active process to determine if a higher or better bid exists.  Accordingly, the Debtor requests that the Court make a finding that the Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

## G.    The Court Should Approve the Assumption and Assignment of Contracts Under Section 365 of the Bankruptcy Code

46.    In connection with the approval of the Sale to the Buyer, the Debtor also requests approval of the assumption and assignment of contracts to the Buyer as necessary to effectuate the transfer of the Purchased Assets.

47.     Section 365 of the Bankruptcy Code permits a debtor to assign an executory contract or unexpired lease if "(A)     the [debtor] assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease."  11 U.S.C. § 365(f)(2).  Section 365(a) of the Bankruptcy Code authorizes a debtor to assume an executory contract or unexpired lease, and section 365(b)(1), in turn, codifies the requirements for such assumption, providing that:

> (b)(l) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee –
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C)     provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."  *See In re Texas Health Enters., Inc.*, 246 B.R. 832, 834 (Bankr. E.D. Tex. 2000); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1989); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985).

48.     It is well established that the decision to assume or reject an executory contract or unexpired lease is a matter within the "business judgment" of the debtor.  *See In re Pilgrim's*

*Pride Corp.*, 403 B.R. 413, 422-26 (Bankr. N.D. Tex. 2009); *Richmond Leasing Co. v. Capital Bank, N.A. (In re Richmond Leasing Co.)*, 762 F.2d 1303, 1309 (5th Cir. 1985); *Delightful Music Ltd. v. Taylor (In re Taylor)*, 913 F.2d 102, 107 (3d Cir. 1990).  Accordingly, assumption or rejection of any executory contract is appropriate where the assumption or rejection would benefit the estate.

49.     The assumption and assignment of any contracts necessary to the transfer of the Purchased Assets satisfies the requirements of section 365 of the Bankruptcy Code.  First, to the extent that there is any default under any of the assumed contracts, the Purchase Agreement will provide that any such defaults will be cured as part of the transaction.  Second, any buyer will be required to demonstrate sufficient ability to continue performance under each of the assumed contracts.  To the extent necessary (or requested by any party in interest), the Buyer or any other Successful Bidder will demonstrate that adequate assurance of future performance is present.  Thus, the requirements for assumption and assignment under section 365 of the Bankruptcy Code are satisfied.

50.     The assumption and assignment of the assumed contracts is an integral part of the Sale.  The Sale of the Purchased Assets to the Buyer will provide significant benefit to the Debtor's estate and allow the Debtor, in its business judgment, to maximize the value of the Purchased Assets for the benefit of its estate.   Thus, the assumption and assignment of any contracts necessary to the transfer of the Purchased Assets is a sound exercise of the Debtor's business judgment.  Accordingly, the Debtor requests that the assumption and assignment be approved, notwithstanding any anti-assignment provisions therein.

### V.  REQUEST FOR RELIEF UNDER BANKRUPTCY RULE 6004(h)

51.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6004(h).

52.     The Debtor requests that the Sale Order be effective immediately by providing that the 14-day stay under Bankruptcy Rule 6004(h) is inapplicable and waived, so that it may proceed as expeditiously as possible with the Sale.  As described above, the Debtor believes that, absent a prompt sale, the value of the Purchased Assets will decline in value to the detriment of its creditors.  Therefore, it is imperative that the Sale Order be effective immediately to permit the Sale to close without any further delay.

## VI.  CONCLUSION

**WHEREFORE**, the Debtor respectively requests that the Court (i) enter an order, substantially in the form attached as **Exhibit C**, approving the Bidding Procedures and Bid Protections; and (ii) enter an order (a) authorizing the Sale of the Purchased Assets to the Buyer or another Successful Bidder free and clear of all liens, claims, encumbrances, and other interests pursuant to sections 105, 363(b), (f), (m), and 365 of the Bankruptcy Code; (b) to the extent necessary, authorizing the Debtor to assume and assign executory contracts; and (c) granting such other and further relief to the Debtor as the Court may deem proper.

DATED: June 3, 2015
        Austin, Texas

<div style="margin-left:40%">

Respectfully Submitted,

TAUBE SUMMERS HARRISON TAYLOR
MEINZER BROWN

/s/ MORRIS D. WEISS
Eric J. Taube
State Bar No. 19679350
Morris D. Weiss
State Bar No. 21110850
Christopher G. Bradley
State Bar No. 24069407
100 Congress Avenue, Suite 1800
Austin, Texas 78701
(512) 472-5997
(512) 472-5248 (FAX)
etaube@taubesummers.com
mweiss@taubesummers.com
cbradley@taubesummers.com

PROPOSED ATTORNEYS FOR DEBTOR
AND DEBTOR IN POSSESSION

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing document has been served electronically upon all parties receiving the Court's ECF Notices; and on the parties on the attached Service List by depositing same in the United States First Class Mail (unless otherwise noted) on the 3rd day of June, 2015.


_____*/s/ Morris D. Weiss*_____
Morris D. Weiss