UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

IN RE: §
§
OXANE MATERIALS, INC. § CASE NO. 15-32940
(Debtor) § (Chapter 11)
§

# DECLARATION OF GREGORY S. MILLIGAN IN SUPPORT OF
# THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Gregory S. Milligan, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true to the best of my knowledge, information, and belief:

I am the Chief Restructuring Officer of Oxane Materials, Inc. ("**Oxane**" or the "**Debtor**"), and I am generally familiar with the day-to-day operations, business, and financial affairs of Debtor, as debtor and debtor in possession.[1]

I submit this declaration (the "**Declaration**") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of this chapter 11 case and in support of (i) the Debtor's voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on May 31, 2015 (the "**Petition Date**") and (ii) the relief, in the form of motions, that the Debtor has requested of the Court that are set for hearing on June 5, 2015, at 10:00 a.m. (the "**First Day Motions**").  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.  Any summary of the relief sought in the First Day Motions is qualified in its entirety by reference to such motions which are incorporated herein by reference.

---

[1] I was retained by the Debtor on May 28, 2015, immediately prior to the May 31, 2015 Petition Date although I had been having some informal discussions with the company and its counsel for several days prior to my retention.

Except as otherwise indicated, all facts set forth in this Declaration are based upon knowledge obtained from my review of the Debtor's records, from my discussions with members of the Debtor's Board of Directors, a former finance department employee of the Debtor, and other of the Debtor's advisors, from my opinions based upon my experience, and from my knowledge of the Debtor's operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration and the manner in which I have come to be informed of them. I am authorized to submit this Declaration on behalf of the Debtor.

This Declaration is intended to provide a summary overview of the Debtor and this chapter 11 case.

I. **Debtor's Business and Financial Information**

1.  The information contained in this and the following section, concerning Debtor's business and financial information and the background to the Debtor's bankruptcy filing, is based upon my review of relevant books and records, including documents prepared by professionals retained by the Debtor for the purpose of the prior sales processes, and my discussions with certain of the Debtor's directors and a former finance department employee of the Debtor.

2.  The Debtor is a Delaware corporation with its headquarters in Houston, Texas. As of the Petition Date, the Debtor had essentially ceased operations, and is working toward a sale of substantially all of its assets.

3.  The Debtor manufactured and supplied ceramic proppants, which are materials used in oil and gas fracking operations to increase the efficiency of production. The technology was spun off from the Nanotechnology Institute of Rice University, and the Debtor holds at least fifteen patents and has other patents pending. Though the technology has been successful in operation, the marginal cost of producing the proppants was, at the scale produced, higher than

the price that consumers of the products would pay. The Debtor raised capital through debt and equity financing, but reached the point where additional capital infusions were unavailable. The Debtor retained Lazard Frères in early 2014 to market the company; notwithstanding extensive marketing efforts, Lazard was unable to locate a buyer as of the spring of 2015, and efforts to locate additional capital have been unsuccessful.

4.     Currently, the Debtor has over $6.7 million outstanding in senior secured debt, approximately $34.7 million in subordinated debt, along with over $3.5 million in trade debt. As of the Petition Date, the Debtor had total assets with a book value of approximately $48.7 million and total liabilities of approximately $45.2 million; upon information and belief, the market value of the Debtor's assets is substantially less, as most of the book value is related to fixed assets booked at cost, less depreciation. The Debtor's intangible assets (primarily patents) are not reflected on the Debtor's financial statements. Upon information and belief, the actual value of the Debtor's tangible and intangible assets are substantially less than the indebtedness.

5.     The Debtor's assets consist largely of intellectual property assets, manufacturing and laboratory related assets, and real property located in Arkansas.

## II.     Background to Bankruptcy Filing

6.     While Oxane developed a suite of outstanding proppant products, the steep dip of the world oil markets coupled with the adoption of austerity measures by the oil and gas development community proved to be too much for Oxane to weather. Accordingly, it was forced to seek the protection of this Court to marshal its remaining resources for its creditors.

7.     A brief history of the events that led to this bankruptcy filing is given as follows:

8.     In January 2014, the Board of Directors (the "**Board**") of Oxane approved a resolution to engage the investment banking firm of Lazard, Frères & Co. ("**Lazard**") to run a sale process to secure an exit for existing stockholders.

9. It is my understanding that the Debtor raised in excess of $150,000,000 in equity financing between 2005 and 2013. From February through June 2014, existing stockholders provided senior subordinated secured convertible financing (the "**Financing**") to Oxane in the aggregate principal amount of $27 million to provide sufficient cash runway to execute the sale process. The Financing is subordinated to Oxane's senior bank financing with Comerica Bank ("**Comerica**" or the "**Lender**").

10. In connection with the sale process, Lazard sent a potential investment opportunity teaser to 106 potential acquirers (forty-seven Tier 1 acquirers). Oxane entered into Non-Disclosure Agreements with, and distributed Confidential Investment Memorandums to, twenty-two potential acquirers, and Oxane conducted eleven executive management meetings with potential acquirers.

11. By August 2014, the Lazard sale process was determined to be unsuccessful as no offers had been received.

12. In October 2014, the Board elected to shut down one of the two production lines at Oxane's Van Buren, Arkansas, manufacturing plant to reduce its cash burn from approximately $4.3 million to $2.9 million per month.

13. One major manufacturing company that withdrew from the Lazard sale process before its conclusion remained interested in Oxane, however, and the Board authorized engaging with such potential acquirer with the objective being the sale of Oxane. This major manufacturing company engaged with Oxane accordingly and, in November 2014, visited Houston and outlined an engagement plan lasting 4-8 weeks for due diligence and analysis to determine a possible transaction. This engagement led to an additional financing of $5.4 million during Q4 2014 from two major stockholders in a separate $12.4 million senior subordinated

secured convertible financing facility that was pari passu to the February 2014 Financing. This financing was offered to all stockholders for participation by January 16, 2015, but no other existing stockholders elected to provide additional financing for Oxane.

14. On November 23, 2014, Oxane announced that the manufacturing plant would close in sixty days due to the existing market conditions and the falling price of oil, and that the resources that would otherwise be used to operate the plant would be refocused on R&D to develop Oxane's deep-water OxThor product—a product believed by Oxane to offer a more likely path towards near-term profitability.

15. The major manufacturing company continued due diligence with meetings and plant visits through the remainder of 2014 and into 2015, but did not adhere to the original timeline of 4-8 weeks.

16. In December 2014, Lazard and Oxane re-engaged with thirteen potential strategic acquirers in a second structured sale process with the most active participants from the first sale process run by Lazard. This process relied upon the revised OxThor strategy following the announcement in November 2014 of the shutdown of Oxane's manufacturing plant on January 23, 2015. Unfortunately, ceramic proppant plant closings had been announced by three other major competitors during this timeframe, as the downturn significantly affected the industry.

17. On January 23, 2015, Lazard sent process letters to twelve potential strategic acquirers identified during the earlier sale process, and such distribution was accompanied with a draft form of merger agreement and disclosure schedules, with a request for bids by February 6, 2015. Lazard did not receive any bids from parties that received process letters. In early February 2015, Lazard provided additional guidance regarding structure and minimum bid requirements. Only two potential acquirers were responsive and remained engaged.

18. The major manufacturing company continued in due diligence throughout 2014 and to the end of March 2015. Despite multiple iterations of directional guidance throughout February and March 2015 that it was interested in a 100% acquisition of Oxane, it did not provide a bid to Oxane prior to March 31, 2015.

19. A new party identified by Lazard was a privately-held manufacturing company. This company provided a non-binding letter of intent ("**LOI**") to Oxane in late March 2015 to purchase all of Oxane's assets for cash consideration and a revenue-based royalty structure, and Oxane executed the non-binding LOI on March 31, 2015. However, following three weeks of due diligence, the counterparty's board formally withdrew their offer on April 22, 2015, citing the current oil price environment, the incremental capital needed to commercialize OxThor, and the potential lack of ability for Oxane to close out all liabilities and deliver a clean transaction due to the amount of existing liabilities.

20. Oxane management ran a third sale process seeking bids on all or parts of Oxane's assets, including equipment and intellectual property, following the withdrawal of the two potential acquirers that had engaged in due diligence related to a potential acquisition of Oxane.

21. However, in May 2015, the Board and the necessary stockholders of Oxane approved a filing for bankruptcy protection under chapter 11 of the Bankruptcy Code requiring the liquidation of Oxane in an orderly fashion and engaged a chief restructuring officer to manage the orderly liquidation process to secure the maximum return for creditors of Oxane.

### III. Summary of First Day Motions

22. The Debtor has filed a number of First Day Motions, which the Debtor believes are necessary to enable it to move forward with a sale of the Debtor's assets. The Debtor respectfully requests that the relief requested in each of the First Day Motions be granted. Such

relief is a critical element in reducing costs and achieving the highest possible return from asset sales in this chapter 11 case.

23. The information contained in this section is based upon my review of the Debtor's records and operations, my discussions with the Debtor's advisors, directors, and a former finance department employee of the Debtor, my experience in other restructurings, and my own knowledge of and involvement in the discussions and negotiations that led to certain of the various referenced agreements and Motions.

24. A summary description of the relief requested and the facts supporting each of the First Day Motions is set forth below.

A. Debtor's Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Providing for Adequate Protection [Doc. 10] (the "**Cash Collateral Motion**")

25. In the Cash Collateral Motion, the Debtor requests the entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**"), authorizing the Debtor to use the cash collateral of the prepetition secured lender (the "**Lender**"). The relief requested may be briefly summarized as follows:

26. The Debtor has a limited amount of cash on hand and is collecting some additional cash arising from pre-petition receivables (altogether, the "**Cash Collateral**"). The Lender will consent to the use of the Debtor's Cash Collateral—which is all or substantially all already pledged to the Lender—to fund limited operations and to pay the costs and expenses of administering this chapter 11 case (as reflected in the initial Budget attached to the Cash Collateral Motion).

27. It is absolutely essential that the Debtor use a portion of the Cash Collateral in order to conduct the bare-bones operations that are contemplated in order to preserve the value of the estate in this bankruptcy proceeding. The Debtor has no capacity to raise funds, as its recent

course of business dealings (discussed above) makes clear. The inability to make use of this Cash Collateral would cause immediate and irreparable harm. The proposed use of the Cash Collateral is specified in the initial Budget, which will be supplemented before the Final Hearing on the Cash Collateral Motion.

28. In return for allowing the Debtor to use the Cash Collateral, the Lender will receive an Adequate Protection Lien to cover any Diminution in Value in the Lender's current collateral, as well as a superpriority administrative claim, again only to the extent of any Diminution in Value. The Adequate Protection Lien and superpriority claims will both be subject to a carve-out for professional and U.S. Trustee fees.

29. The Lender's liens will be subject to an Investigation Period, at the end of which the Lender's liens will be deemed fully valid, perfect, enforceable, and first-priority. The Lender has agreed to a carve-out of up to $15,000 of the Debtor's professional fees to be permitted to be used to investigate its liens during the Investigation Period.

30. The Debtor believes that the terms that the Lender has agreed to are reasonable in light of the risk the Lender is undertaking in agreeing to the relief requested, and in light of the dire need of the Debtor for the requested funding.

31. Accordingly, the Debtor requests that the Court approve this relief on an interim basis, and set a final hearing in due course as requested in the motion.

B. Emergency Motion of the Debtor for (I) an Order Approving Bidding Procedures and Bidder Protections for the Sale of Certain Designated Assets; and (II) an Order Approving the Sale of Certain Designated Assets Free and Clear of All Liens, Claims, and Encumbrances Pursuant to 11 U.S.C. §§ 105, 363(b), (f), (m), and 365, and Granting Related Relief [Doc. 11] (the "**Sale Motion**")

32. The Debtor has filed the Sale Motion in an effort to initiate the process of selling certain valuable intellectual property assets (the "**IP Assets**" or "**Purchased Assets**"). The proposed sale procedures may be summarized as follows:

- The proposed auction process relies on Halliburton serving as a stalking horse bidder, with an opening bid of $2,500,000, a breakup fee of $100,000, and bid increments of $50,000 (in addition to the breakup fee).

- The Due Diligence Period lasts for twenty-one days from the filing of the Sale Motion, at which time Halliburton will elect to proceed as stalking horse bidder or not.

- If Halliburton elects to go forward with the transaction, other interested parties will have several days to put together and submit their competing bids; if other Qualified Bids are received, then an Auction will be held.

- If Halliburton opts not to proceed at the end of the Due Diligence Period, the Debtor will return to the Court and propose altered procedures, informed by the amount of interest that the IP Assets have generated and whether any potential alternate bidders have stepped forward.

33. The extensive prior marketing efforts of Lazard, as described above, give some assurance that many or most potential buyers will have already been contacted at some point and will have a general awareness of Oxane's IP Assets. The Debtor's hope is that with a credible stalking horse bidder in place, the proposed Auction will both draw out serious bidders as well as maximize the price that the estate receives for these assets.

34. Even if Halliburton ultimately opts not to proceed as stalking horse, the Debtor's hope is that amended sales procedures can be devised that will yield significant funds for the estate.

C. Motion to Reject Real Property Leases *Nunc Pro Tunc* [Doc. 7]; Motion to Reject Railcar Leases *Nunc Pro Tunc* [Doc. 8] (collectively, the "**Motions to Reject Executory Contracts and Leases**")

35. The Debtor has filed the Motions to Reject Executory Contracts and Leases in order to release the estate as soon as possible from certain burdensome payment obligations that are without continuing value to the estate. The relief requested in these motions may be summarized as follows:

36. Prepetition, the Debtor leased three warehouse facilities in Fort Smith, Arkansas; each of these leases is a month-to-month oral sublease. The leases are for the following locations (the "**Leased Premises**"):[2]

    a. Jenny Lind Warehouse, 7209 Jenny Lind Road, Fort Smith, AR 72901.

    b. 5th St. Warehouse, 3109 South 5th St., Fort Smith, AR 72916.

    c. E Street Warehouse, 100 South E St., Fort Smith, AR 72901.

The Lessor for each of these facilities is Arkansas Warehouse, Inc.

37. Prior to the Petition Date, the Debtor ceased active operations at the Leased Premises. There are currently raw materials stored at each of the sites that were conveyed before the Petition Date and, I believe, are no longer property of the Debtor. Additionally, there are certain other materials located at Jenny Lind and E Street warehouses, which are owned by the Debtor and have been or will be substantially removed the week of June 1, 2015.

38. The Debtor is in discussions with Arkansas Warehouse regarding a possible consensual resolution of this Motion.

39. Additionally, pre-petition, the Debtor leased railcars and a "railcar spot" as follows:

    a. "Lease of Railway Covered Hopper Cars" with Chicago Fright Car Leasing Co., Lease No. 1171, dated November 21, 2011, as supplemented by a First Supplement, Second Supplement and Third Supplement, for a lease totaling forty-two rail cars (collectively, the "**Railcar Lease**"); and

    b. "Oxane Odessa Agreement" with Francis Drilling Fluids, Ltd, dated effective April 1, 2013, for a twenty railcar spot located at the Francis Drilling Fluids facility at 3215 West Murphy, Odessa, Texas 79763 (the "**Railcar Spot Lease**").

---

[2] The Debtor is a party to other real property leases, including two facilities in Houston and an additional facility in Van Buren, Arkansas, which the Debtor is not seeking to reject at this time.

40. As with the Leased Premises, the Debtor does not need the leased railcars nor the railcar spot, nor does it believe it could obtain any value from the assumption and assignment of them. To the contrary, continuing to pay rent under the warehouse leases, Railcar Lease, or Railcar Spot Lease would be a needless expense and drain on the Debtor's resources, and nothing more than a burden to the Estate. Accordingly the Debtor has requested that the Court approve the rejection of these unexpired leases and executory contracts.

D. Motion of the Debtor for Interim and Final Orders Pursuant to Sections 105(a) and 366 of the Bankruptcy Code to (i) Approve Debtor's Proposed Form of Adequate Assurance and (ii) Prohibit Utilities from Altering, Refusing, or Discontinuing Service [Doc. 9] (the "**Utility Motion**")

41. In connection with the operation of its business and management of its properties, the Debtor obtains electricity, natural gas, water, telephone services, and/or other similar services (collectively, the "**Utility Services**") from a number of utility companies or their brokers (collectively, the "**Utility Companies**").

42. When the Debtor was operating its business, its utilities bills were in excess of $350,000 per month. Since ceasing business operations, the Debtor is now paying approximately $20,000 per month on account of Utility Services. Historically, the Debtor has had a very good payment history with the Utility Companies. The Debtor estimates that its cost for Utility Services during the next thirty days (not including any deposits to be paid) will be less than $20,000, assuming the Court approves rejection of certain leases.

43. Uninterrupted Utility Services are essential to the Debtor's ongoing operations and the success of the Debtor's chapter 11 case. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtor's business operations could be severely disrupted, and such disruption would jeopardize the Debtors' efforts to sell its business. It is essential that the Utility Services continue uninterrupted during the chapter 11 case.

44. The Debtor intends to pay timely all postpetition obligations owed to the Utility Companies. To provide adequate assurance of payment to the Utility Companies, the Debtor proposes to provide, within five business days after entry of a Final Order approving the Utility Motion, a deposit in the aggregate of a sum equal to approximately fourteen days of Utility Services, (the "**Adequate Assurance Deposit**") into an interest-bearing, newly created segregated account (the "**Utility Deposit Account**") for the benefit of any Utility Company unless a Utility Company agrees to a lesser amount; provided, however, that if a Utility Company was in possession of a deposit from the Debtor for Utility Services on the Petition Date, it will not be entitled to the benefit of the Adequate Assurance Deposit. The Utility Deposit Account shall be held in escrow pending further order of the Court. The Debtor requests the right to withdraw funds from the Utility Deposit account to the extent such funds were deposited on account of a Utility Company that is subsequently removed from the Utility Service List. Based on the foregoing calculation, for those Utility Companies on the Utility Service List, the Debtor estimates that the total amount of the Adequate Assurance Deposit will be approximately $10,000.

45. The Debtor submits that the Adequate Assurance Deposit constitutes sufficient adequate assurance to the Utility Companies. If any Utility Company believes additional adequate assurance is required, they may request such assurance pursuant to the procedures set forth in the Utility Motions.

E.  Debtor's Motion Pursuant to Sections 105(a), 345(b), 363(c) and 364(a) of the Bankruptcy Code for (I) Authority to Continue to Use Existing Cash Management System, (II) Authority to Maintain Existing Bank Account and Business Forms, and (III) a Waiver of the Requirements of Section 345(b) of the Bankruptcy Code (the "**Bank Account Motion**")

46. In the Bank Account Motion, the Debtor requests, pursuant to sections 105(a), 345(b), 363(c), and 364(a) of the Bankruptcy Code (i) authority to continue to use of existing

cash management system, (ii) maintain existing Bank Account and business forms (in this case, checks), and (iii) a waiver of the requirements of section 345(b) of the Bankruptcy Code.

47. By this Motion, the Debtor moves the Court for an order authorizing the Debtor to continue to maintain and use the Bank Account. The Debtor further seeks authorization to have the Bank Account deemed and renamed debtor-in-possession accounts under the United States Trustee's rules and regulations.

48. The Debtor is in discussions with the office of the United States Trustee regarding potential resolution of the Bank Account Motion that may result in its withdrawal.

Based on the foregoing, I believe that the relief requested in the First Day Motions is necessary and appropriate, is in the best interests of the estate and the creditors, and should be granted in all respects.

Dated: June 4, 2015

                                        _/s/ Greg Milligan_
                                        Gregory S. Milligan
                                        Chief Restructuring Officer
                                        Oxane Materials, Inc.